Rodney E. YOUNG, Jason E. Banach, Karen T. Banach, Ted E. Hall, and Michael E. Hall, on behalf of themselves and all others similarly situated, Appellants (Plaintiffs Below),

v.

GENERAL ACCEPTANCE COR-PORATION, et al., Appellees (Defendants Below).

No. 53S04–0206–CV–345.

Supreme Court of Indiana.

June 21, 2002.

Eric Allan Koch, Bloomington, IN, Timothy J. Storm, Chicago, IL, Attorneys for Appellants.

Joseph H. Yeager, Jr., Thomas A. Withrow, O. Wayne Davis, B. Keith Shake, Indianapolis, IN, Geoffrey M. Grodner, Kendra Gowdy Gjerdingen, Lonnie D. Johnson, Bloomington, IN, Attorneys for Appellees.

## ON PETITION TO TRANSFER

BOEHM, Justice.

This case concerns the proper application of Indiana's Control Share Acquisition Statute where the control at issue does not arise from the acquisition of shares, but by a contractual agreement to elect certain members to a public corporation's board of directors.

### Factual and Procedural Background

In 1988, Malvin and Russell Algood, father and son, founded a closely held consumer finance company, General Acceptance Corporation ("GAC"). GAC was initially owned exclusively by Algood family members. Its business was the funding and servicing of high-risk installment contracts to purchase automobiles. Malvin was Chief Executive Officer and chair of the board of directors, and Russell served as president and Chief Operating Officer. In April 1995, GAC made an initial public offering and from that time forward shares of its stock were traded on NASDAQ. In April 1997, when the present controversy arose, there were approximately six million shares of GAC common stock issued and outstanding. Approximately 30 percent of those shares were held by the public, with the remainder held by Malvin and Russell, and their family members and family trusts.

On April 10, 1997, GAC shares closed at $3.25 per share. The next day, Capitol American Life Insurance Company ("CALI"), a Conseco, Incorporated subsidiary, entered into a Securities Purchase Agreement with GAC whereby CALI purchased $10 million face amount of GAC 12 percent subordinated notes, convertible into GAC common stock at $3 per share. Concurrent with that agreement, GAC, Conseco, CALI, and the Algoods entered into a "Stockholders Agreement" which provided that: (1) GAC would increase its board of directors from five to six members; (2) as long as the Algoods owned more than ten percent of GAC's outstanding shares, CALI would vote all of its

shares to elect one person designated by the Algoods to GAC's board; and (3) as long as the debentures represented by the Securities Purchase Agreement were outstanding, the Algoods would vote their GAC shares to elect two directors designated by Conseco. This third provision was later amended to expand the board to eight members and give Conseco the right to designate three nominees.

Over the next eleven months, Conseco, directly or through subsidiaries, made substantial additional investments in GAC. These took the form of purchases of newly issued shares from GAC, and also acquisition of warrants and debentures convertible into GAC common stock. All of these transactions were at prices significantly lower than $3 per share, and the last block of shares was purchased for 25 cents per share. Ultimately Conseco acquired all of the Algoods' shares in addition to these blocks of newly issued shares.[1] The net result of those transactions was that Conseco or its subsidiaries came to acquire over 90 percent of GAC common stock. Conseco then proposed to eliminate GAC's remaining public shareholders for cash. The mechanism adopted to accomplish this was a proposed merger between GAC and CIHC, Incorporated, Conseco's wholly owned subsidiary, whereby all GAC shareholders other than Conseco would receive 30 cents for each share. GAC's board called a shareholders meeting for August 31, 1998 to vote on the proposed merger.

The minority shareholders responded to the proposed merger by filing a class action suit. The complaint consisted of twelve counts, alleging, inter alia, breaches of fiduciary duties, non-compliance with the Indiana Control Share Acquisition Statute, and appraisal rights under the Indiana Dissenters' Rights Statute arising from the merger. The plaintiffs also sought a preliminary injunction to block the vote on the proposed merger. The trial court denied the injunction request, and the merger was completed. The court then granted the defendants' motion for summary judgment on the breach of fiduciary duty claims, finding that the dissenters' rights and appraisal procedure provided the plaintiffs their only remedy arising from the merger, and also that the plaintiffs were barred from bringing a direct action as shareholders, as opposed to a derivative action on behalf of GAC.

The trial court also dismissed the plaintiffs' count based on the Control Share Acquisition Statute, holding that no "control share acquisition," as that term is defined in Indiana Code chapter 23–1–42, took place in the course of Conseco's dealings with the Algoods. Finally, the trial court dismissed the plaintiffs' claim for dissenters' rights, explaining that the plaintiffs' attempt to initiate an appraisal in this proceeding was inappropriate. The Court of Appeals affirmed.

We grant transfer to address the proper application of the Control Share Acquisition Statute to this unusual situation. We affirm the trial court, but for different reasons.

## Control Share Acquisitions

The minority shareholders contend that the proposed merger was in violation of Indiana's Control Share Acquisition Statute, Indiana Code 23–1–42 (1998). A control share acquisition is defined by that chapter as "the acquisition (directly or indirectly) by any person of ownership of, or the power to direct the exercise of voting power with respect to, issued and outstanding control shares." I.C. § 23–1–42–2(a). "Control shares" are defined as:

---

1. The transactions are set forth in detail in the Court of Appeals opinion. *Young v. Gen. Acceptance Corp.,* 738 N.E.2d 1079, 1083–84 (Ind.Ct.App.2000).

shares that, except for this chapter, would have voting power with respect to shares of an issuing public corporation owned by a person or in respect to which that person may exercise or direct the exercise of voting power, would entitle that person, immediately after acquisition of the shares (directly or indirectly, alone or as a part of a group), to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of voting power:

(1) One-fifth (1/5) or more but less than one-third (1/3) of all voting power.

(2) One-third (1/3) or more but less than a majority of all voting power.

(3) A majority or more of all voting power.

*Id.* at § 23–1–42–1. The effect of this chapter is that a party who acquires "ownership or the power to direct the voting power with respect to" control shares is prohibited from exercising the accompanying voting power unless and until that power is granted by vote of a majority of the remaining shareholders. *Id.* at § 23–1–42–9.

■ It is not entirely clear how the plaintiffs seek to deploy the control share statute. They contend that the merger of GAC into CIHC was void because the control share statute nullified any action taken by GAC by virtue of shareholder action in which Conseco purportedly exercised or directed the exercise of 20 percent or more of the voting power of GAC. This misconceives the effect of a control share transfer. The effect of the application of the statute is not to disable all shares owned by the acquirer. Rather it prevents only the voting of the shares acquired in the control share acquisition, i.e. only the shares in the regulated transaction are

prevented from voting until the remaining shareholders approve. There appears to be no claim here that the board of GAC was not elected by a majority of other shares, so even if the statute disabled some shares from voting, the challenged actions appear to have been taken by properly elected directors. Similarly, the only shareholder action appears to be the merger itself, which appears to have been presented to a meeting at which the vast majority of Conseco's shares were acquired from GAC as originally issued shares. These, by definition, are not subject to the control share statute, section 23–1–42–2, and are sufficient in number to approve the merger.

■ In any event, we do not find a transaction subject to the control share statute. The gist of the minority shareholders' complaint is not that Conseco's acquisition of the Algoods' shares constituted a control share acquisition. Rather they contend that when Conseco acquired the power, through the Stockholders Agreement, to direct the Algoods to vote for Conseco's nominees to GAC's six-member board of directors, Conseco acquired "control shares" as that term is used in the chapter. The remaining shareholders were never asked to vote to grant voting power to the Algoods' shares after Conseco acquired the right. The plaintiffs contend that the transaction disabled those shares, and therefore any subsequent action taken by GAC requiring the voting of those shares is void.

The trial court denied the plaintiffs' request for an injunction against consummation of the merger. The trial court focused on Conseco's acquisition of the shares of stock, rather than the power to direct voting. To that extent, the trial court correctly found the statute did not apply because the shares acquired by Conseco were not already issued and outstand-

ing. In dismissing the plaintiffs' complaint, the trial court also stated that the Algoods' agreement to vote their shares for Conseco's nominees was not a control share acquisition. This appears to have been based on the defendants' contention that a contractual commitment to vote shares is not subject to the statute. We do not agree with that claim, but agree that the transaction was nevertheless exempt from the statute for the reasons explained below.

The Court of Appeals agreed that there was no violation of the Control Share Acquisition Statute, but relied on its interpretation of the legislative intent behind the statute, as expressed in the official comments to the Control Share Acquisition chapter. The court quoted the comment's opening paragraph, which discussed the intent of the legislature to allow shareholders to vote on "a potentially fundamental change in the nature of their corporation— namely, its shift to being an entity in which a single shareholder acquires a significant level of dominance over the future governance of the corporation." I.C. § 23–1–42, Introductory Cmt. The court reasoned that what Conseco acquired was an already-existing single block of voting rights and, thus, there was no fundamental change in the nature of GAC. In other words, the effect of the Stockholders Agreement was simply that GAC went from a corporation dominated by the Algoods to a corporation dominated by Conseco.

The plaintiffs' contention as to the Control Share Statute proceeds from the foundation that the Stockholders Agreement, by giving Conseco the power to direct voting of the Algoods' shares in election of directors of the GAC Board, constituted a "control share acquisition" within the meaning of the statute. Plaintiffs are correct in that contention. Because Conseco

gave value for the right to direct the voting of these shares, the Stockholders Agreement granted a proxy "coupled with an interest" and not a revocable proxy of the kind typically solicited for shareholder meetings of public companies. 5 William Meade Fletcher, Cyclopedia of the Law of Private Corporations § 2062 (perm. ed., rev. vol. 1996). Unlike a revocable proxy, this constituted an acquisition of the "power to direct the voting" for the Board and is therefore subject to the statute. The defendants contend that the plaintiffs' view of the Control Share Acquisition Statute would result in the invalidating of proxies generally. We do not agree. It is true that a proxy is a grant of authority to exercise voting power. But it is not a grant of the "power to direct" the vote. With limited exceptions, conventional proxies are revocable at any time. The Stockholders Agreement did not expire until the debentures represented by the Securities Purchase Agreement were no longer outstanding and required the Algoods to vote as Conseco directed. The official comment to Indiana Code section 23–1–42–3, defining "interested shares," explains this:

> The critical inquiry in determining whether shares are "interested shares" is who has the ultimate power to exercise or direct the exercise of the voting power of the shares on the date in question. . . . [S]hares do not become "interested shares" simply because the owner grants a revocable proxy. . . . In that case, the beneficial owner, rather than the proxy holder, retains ultimate control over the exercise of the voting power of the shares.

In contrast, these commitments to vote for the Board were given for consideration and became enforceable obligations. Fletcher, supra, at § 2062. As such, they became subject to the control share statute unless some exemption applies. Here, an exemption does apply.

The shares to which the provision related were originally issued to the Algoods who, at the time, were the only shareholders. Section 23–1–42–2(e) of the statute provides an exemption from the definition of control share acquisitions. It states:

> The acquisition of shares of an issuing public corporation in good faith and not for the purpose of circumventing this chapter by or from:
>
> > (1) any person whose voting rights had previously been authorized by shareholders in compliance with this chapter . . .
>
> does not constitute a control share acquisition, unless the acquisition entitles any person . . . to exercise or direct the exercise of voting power of the corporation in the election of directors in excess of the range of the voting power otherwise authorized.

As this subsection explains, and as the comment to it makes clear, where the voting power that is being transferred does not exceed a level of control that was already properly authorized, the transfer of that voting power—through the sale of shares or, in this case, by contract—is not subject to another authorizing vote by the shareholders. As the comment points out, "Subsection (e) was included because such transfers generally will not . . . significantly alter the existing pattern of voting power concentration in the corporation." I.C. § 23–1–42–2(e), Official Cmt. Simply put, a shareholder who purchases shares in a corporation that has, at the time, a dominant shareholder, has no complaint if that dominant shareholder transfers its holdings to another. This is basically the point on which the Court of Appeals relied. We agree with the theory adopted by the Court of Appeals, but note that the statute itself supports it.

Although GAC's initial prospectus is not included in the record, the plaintiffs' complaint states that after GAC's initial public offering in April 1995 only 32 percent of the corporation's shares were in public hands. Otherwise stated, 68 percent remained owned by Algood interests. This exceeds 50 percent and was a transfer in the highest "range" of voting power defined by section 23–1–42–1. The transfer to Conseco did not (indeed no transaction could) raise Conseco's voting power to a higher range. As a result, the exception of subsection 2(e) applies.

■ It is correct that this exception arguably does not literally apply because the Algood holdings were acquired at the initial founding of the corporation and were not subject to a vote of shareholders. At the time the Algoods acquired their initial shares GAC was presumably exempt from the Control Share Statute because it had fewer than 100 shareholders. I.C. § 23–1–42–4. In any event, the initial issue to the Algoods was not subject to the Control Share Statute because the Algoods acquired the shares from GAC in a transaction approved, indeed designed, by GAC's organizers. Thus there was never a shareholder vote granting voting rights to the Algoods. But the voting rights of the original shares issued to the Algoods were, we think, "authorized by the shareholders" of the closely held corporation when the initial shareholders acquired stock in the corporation with that capital structure. When the initial public offering took place, the public shareholders bought into the existing arrangement, presumably with full knowledge of the Algoods' dominant voting position. We can see no reason why a majority shareholder who acquired that status from the outset of the corporation in an exempt transaction should be in any different position from one who acquired the shares after the company became publicly owned and received shareholder approval under the Act. Accordingly, the Al-

goods were able to transfer their shares or grant to Conseco the power to direct the voting of their shares without further shareholder action.

## Conclusion

For the reasons given above, we grant transfer and affirm the trial court's dismissal of the count of the plaintiffs' complaint alleging a violation of the Control Share Acquisition Statute. As to all other issues, the Court of Appeals is summarily affirmed. Ind. Appellate Rule 58(A)(2).

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.